IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JACK B. BLOUNT,<br><br>Defendant. | Civil Action No. 4:24-cv-375 |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against Defendant Jack B. Blount ("Blount"), and alleges as follows:

## SUMMARY

1. Intrusion Inc. ("Intrusion" or the "Company") is a publicly traded cybersecurity company. Beginning in May 2020, the Company—primarily through Blount, its president, CEO, and director at the time—began promoting a new cybersecurity product that it called "Intrusion Shield" ("Shield"). From May 2020 through May 2021, in press releases, earnings calls, interviews, and other statements, Intrusion and Blount made materially false and misleading statements regarding: (a) Blount's background and experience; (b) the Company's success in marketing Shield to participants in its beta testing program; and (c) certain Company contracts, or purported contracts, with prospective customers. These statements were authored and/or approved by Blount.

2. By engaging in the conduct alleged herein, Blount violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. The SEC brings this action seeking a permanent injunction, an officer-and-director bar, and a civil penalty.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over this action under Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Blount directly or indirectly made use of means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

4.      Venue in this district is proper under Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this district.

## DEFENDANT

5.      **Blount** is a resident of Columbus, Missouri. Blount was CEO and president of Intrusion from May 27, 2020 to July 19, 2021, when Intrusion's board of directors terminated his employment. Blount was a member of Intrusion's board from May 27, 2020 until his resignation on August 3, 2021.

## RELEVANT ENTITY

6.      **Intrusion** is a Delaware corporation with its principal place of business in Plano, Texas. Intrusion's common stock trades under the ticker symbol INTZ on the Nasdaq Capital Market and has been registered with the SEC pursuant to Section 12(b) of the Exchange Act since October 8, 2020. Prior to that date, the Company's common stock was registered with the SEC pursuant to Section 12(g) of the Exchange Act. Intrusion is required to file periodic and

current reports with the SEC pursuant to Section 13(a) of the Exchange Act and the related rules thereunder.

## FACTS

### Intrusion's Background and its Launch of Shield

7. Until 2020, Intrusion sold cybersecurity consulting services and two cybersecurity products that detected, analyzed, and reported cyberattacks or misuse of information. Intrusion's customers during this time included government defense and security agencies and two commercial customers ("Customer A" and "Customer B"). In 2018 and 2019, Intrusion had a small net income because of large, one-time contracts, but operated at a loss the prior four years. In May 2020, following the death of Intrusion's co-founder and longtime chief executive, the Company appointed Blount as its CEO.

8. Blount worked with the Company's engineers to develop Shield, which was largely based on Intrusion's existing products with certain additional enhancements and functionality. After commercial launch of Shield in January 2021, Intrusion offered Shield as a software-as-a-service product at $20 per "seat" (essentially per user), per month with no annual contract requirement.

### Blount Reshaped the Company's Culture

9. Upon being appointed CEO in May 2020, Blount changed the Company's previously cautious and fiscally conservative culture. He persuaded Intrusion's board of directors to appoint his longtime friend and former colleague as a director and, shortly thereafter, as chairman, and he essentially forced out or fired some of the Company's senior leadership. Under Blount, Intrusion expanded rapidly, growing from approximately 30 employees to 110.

**Intrusion's and Blount's False and Misleading Statements**

10. Beginning with his appointment in May 2020, Blount used his forceful, assertive style to tout his background and experience and to promote Shield as a cybercrime prevention tool. During these promotional efforts, Intrusion made numerous false and misleading statements (discussed in detail below), which were authored and/or approved by Blount.

*Intrusion and Blount Misrepresent Blount's Background*

11. Intrusion and Blount made false and misleading statements regarding Blount's cybersecurity and public company experience. The Company issued a press release on May 27, 2020 (and a purportedly corrective press release on May 29, 2020) announcing the appointment of Blount, which claimed that he had served as a director of five public companies. The May 29, 2020 press release also stated that Blount had served as CIO (chief information officer) of the U.S. Department of Agriculture ("USDA"). Neither statement was true. Blount approved both false press releases.

12. First, Blount had served on, at most, four public company boards. One of those four companies was not a U.S. public company, a second never identified him as a director in its public filings, and his tenure on a third company's board lasted less than four months. In addition to the Company's May 2020 press releases, Intrusion also included the false and misleading statement regarding Blount's public company experience in: (a) its Forms S-1 and S-1/A filed with the SEC in August and October 2020, respectively; (b) the prospectus for its October 2020 securities offering; and (c) its April 5, 2021 proxy statement. Blount signed the Forms S-1 and S-1/A, as well as the proxy statement, which incorporated the misleading statement regarding Blount's public company experience.

13. Second, Blount was never the CIO of the USDA. He did hold the position of director of the Information Technology Services Division within the National Finance Center

("NFC"), a subdivision of the USDA. In that position, he performed the functions of the CIO of the NFC and reported to the chief financial officer of the NFC, which primarily provides payroll processing and other financial and personnel services to the USDA and other federal agencies. Blount repeated the false and misleading claim about serving as the CIO of the USDA in an October 2020 public offering roadshow presentation and a January 2021 investor conference presentation; both presentations were attached as exhibits to Forms 8-K filed by the Company with the SEC and signed by Blount. Similarly, in an April 2021 radio interview, Blount falsely and misleadingly stated that he "…was a CIO in the federal government a few years ago, fighting the Russians and Chinese for our entire federal government…." Although the NFC provided payroll services to many federal agencies, Blount was not the CIO of the USDA and did not serve the entire federal government in his USDA position. Blount's false and misleading statements regarding his background were material because they led investors to believe that the Company's most senior leader was more qualified, experienced, and accomplished than he actually was.

***Intrusion and Blount Overstate the Company's Success Marketing Shield to Beta Testers***

14. During the fall of 2020, Intrusion solicited potential customers to evaluate and test Shield, a process referred to as beta testing. Thirteen companies participated in the beta test, including: (a) Intrusion's public relations firm; (b) Intrusion's securities offering underwriter; (c) a company whose CIO was Blount's son-in-law; (d) an investment adviser that invested in Intrusion; and (e) Customer B, whose chairman was an Intrusion board member. Despite Intrusion's ties to several of the participants, only six of the 13 beta testers ultimately purchased Shield. As set forth below, Intrusion and Blount made statements over the course of several months that misrepresented the beta testing program.

15. First, Intrusion misrepresented the companies that were beta testing Shield. In a written roadshow presentation, which was created by Blount to promote the Company's October 2020 public securities offering and was included as an exhibit to Intrusion's October 5, 2020 Form 8-K filed with the SEC, Intrusion and Blount claimed that Shield had "[v]alidation from early adoption by [a] Fortune 100 beta customer." However, none of the beta testers was a Fortune 100 company.

16. Further, Intrusion and Blount misrepresented the Company's success in converting beta test participants into paying Shield customers. On January 13, 2021, Blount approved an Intrusion press release, attached as an exhibit to a Form 8-K filed by the Company with the SEC and signed by him, stating that "[a]ll of the companies participating in the beta program have made the decision to move forward with Shield in production." The press release also quoted representatives of three of the beta testers, including the CIO of Intrusion's securities underwriter. The same day (January 13, 2021), Blount made a presentation at a securities conference that included the claim that Shield had "[v]alidation from early adoption by 12 'beta' customers." The presentation materials were also attached as an exhibit to the Company's January 13, 2021 Form 8-K signed by Blount and filed with the SEC. Intrusion's stock price closed at $23.88 per share on January 13, 2021, up more than 18.5% from the prior day's closing price, and its trading volume increased more than 30% from the day before.

17. The January 13, 2021 press release issued by Intrusion was false and misleading. By that date, *none* of the beta testers had purchased Shield. In fact, when the Company issued the press release, Blount—who received regular updates regarding the beta testing—knew that several participants **had not** moved forward beyond the beta testing stage. For example, just days prior to the press release, the CIO of Intrusion's underwriter told Blount that the underwriter would continue testing Shield because the product had not yet functioned on the underwriter's

primary network. Moreover, the underwriter's CIO, who was quoted in the press release, had not given Intrusion approval to be quoted in the Company's January 13, 2021 press release. Hours after the press release was published, the underwriter objected to Intrusion and the Company's investor relations firm regarding the unauthorized quotation of its CIO, as well as to the statement that all beta testers were moving forward into production.

18. The next day, January 14, 2021, Intrusion issued a purportedly corrective press release, approved by Blount, that replaced the quote from the underwriter's CIO and stated that "[m]ost companies participating in the beta program are migrating to the production phase of Shield." However, this press release continued to materially overstate and misrepresent Intrusion's success in marketing Shield to its beta testers, as only one company involved in the beta testing had signed a contract at the time the Company issued the January 14, 2021 press release.

19. After the January 2021 press releases, Blount continued to misrepresent—both to investors and to Intrusion's board—the Company's success in marketing Shield to the beta testers. Despite receiving a number of contemporaneous updates showing that only three of the beta testers had signed contracts, Blount told the Company's board on February 4, 2021 that "[m]ost Beta Customers have converted to paying customers." Later that month, Blount, referencing the January 2021 press releases, told an investor in an email that *all* beta testers other than the underwriter were "now under 1 or 3 year contracts." And during the Company's February 25, 2021 earnings call, Blount stated that "90% of our beta customers became paying subscribers on the Shield."

20. The day after the earnings call Intrusion's stock price closed at $24.38, up almost 30% from the prior day's close, and its trading volume increased approximately 629% from the day before. However, all of these claims regarding Shield's beta testing success were false and

misleading. As of February 25, 2021, only three of the 13 beta testers had signed contracts for Shield, while three of the beta testers had indicated they would not purchase it. Finally, despite an April 2021 update to Blount showing that only five beta testers had been "won," Intrusion's presentation materials displayed by Blount at the Company's May 18, 2021 shareholder meeting falsely stated that "[m]ost Beta Customers have converted to paying customers." Intrusion's and Blount's false and misleading statements regarding the beta testing program were material because they misstated and/or overstated the Company's success in marketing Shield, a product that was crucial to both the Company's near-term and long-term financial condition.

### *Intrusion and Blount Mislead Investors about its Contract with Customer A*

21. In early 2021, Blount began to prime the market to expect one or more major Shield contracts. For example, during the February 25, 2021 earnings call, Blount touted interest in Shield from large corporations, referencing Fortune 100 and 500 companies that were evaluating or testing Shield. Then, on March 31, 2021, Intrusion issued a press release announcing that Customer A had signed an agreement to protect its network using Shield. However, the actual terms of that agreement provided for a renewal of an existing contract with Customer A for other Intrusion services (not including Shield), for three years at the same price, as well as for Intrusion to provide Shield for free for three years, with an option for Customer A to renew Shield for another three years at a 93 percent discount. The press release, which referenced Customer A's 46,000 employees worldwide, did not include any information regarding the specific terms of the contract.

22. The March 31, 2021 press release was materially misleading because it omitted that Customer A did not pay for Shield (and had no obligation to ever pay for or use this product). Intrusion's stock price closed approximately 19% higher than the prior trading day after the Company issued the March 31, 2021 press release, and its trading volume increased

approximately 113% from the day before. Two industry analysts who followed Intrusion's stock issued positive reports shortly thereafter, estimating, based on Intrusion's publicized seat pricing for Shield, over $5 million in potential annual revenues from the Customer A contract—an amount greater than 75% of Intrusion's total 2020 revenues of $6.6 million.

23.     Thereafter, Intrusion, through statements made and/or approved by Blount, frequently and prominently referenced the Customer A contract as a Shield-adoption success story. Intrusion not only remained silent regarding the fact that Customer A received Shield for free, but in some instances Blount and the Company implied, or even stated, that Customer A was paying for Shield:

- In an April 13, 2021 press release approved by Blount, Intrusion announced that Shield was "protecting over 50,000 seats," and referenced Customer A signing on as a Shield customer. On April 13, 2021, Intrusion's stock price closed at $28.25, up more than 19% from the prior day. Yet, at the time of this press release, Intrusion only had signed contracts for 550 paid seats.

- In an April 20, 2021 email, Blount told a YouTube finance and technology commentator that all 50,000 seats referenced in the April 13 press release were paid.

- In an April 22, 2021 press release approved by Blount refuting a negative research report about Intrusion and Shield, Intrusion again referenced its multi-year agreement with Customer A without disclosing that Customer A was not paying for Shield.

- During the Company's May 4, 2021 earnings call, Blount specifically referenced Customer A when lauding what he described as the Company's "extraordinary success" in licensing over 50,000 seats for Shield. He went on to explain

Intrusion's lack of first quarter revenues attributable to Shield by pointing to Intrusion's new contract with Customer A to illustrate that Intrusion only received revenue as seats were implemented, saying "[s]o the revenues will come in as they bring on a territory or region and then the revenue start paying." In truth, however, Customer A was not obligated to pay for Shield.

- In a May 10, 2021 YouTube interview with a financial newsletter publisher, Blount discussed the Company's seat pricing for Shield, stating: "So, we are very profitable at $20.00 per seat. It obviously adds up. If you're a Fortune 500 with [Customer A], you know, with thousands and thousands of end users, that becomes a pretty big number pretty fast." However, Customer A was not, in fact, paying for Shield (nor was it obligated to), so its contract would not add "a pretty big number" to Intrusion's sales or income.

24. Similarly, Intrusion and Blount also made false and misleading statements about the status of Customer A's adoption of Shield. In an April 8, 2021 radio interview, Blount said that the Company had installed Shield worldwide for Customer A. And during Intrusion's May 4, 2021 earnings call, Blount claimed that Customer A already had Shield seats implemented by the time of the Company's March 31, 2021 press release. When Blount made these statements, however, Customer A had *no* Shield appliances on its network. Rather, Customer A's cyber defense officer was testing Shield at his residence on his *home* network.

25. During the Company's May 4, 2021 earnings call, Blount also referred to the work that Customer A had conducted to evaluate Shield, stating that it was a major enterprise decision and that "this is as good of a rubber stamp as you can get that says certified, ready for production." But, as Blount knew, Customer A did not test or evaluate any Shield appliance prior

to entering into the contract. In fact, in late March 2021, Customer A's cyber defense officer told Blount that Customer A had not run Shield on its network.

26. Blount understood the importance of the fact that Intrusion had given Shield to Customer A for free, as demonstrated by the numerous steps he took to conceal the contract's actual terms from the public (as described above) and from Intrusion's board and executives. For example, Blount refused to tell Intrusion's chief sales officer the pricing terms of the Customer A deal. Additionally, Blount told the Company's then CFO that the details of the Customer A contract should not be shared with anyone, saying: "I mean nobody. You, me and the board. That's it." Despite this statement, Blount also kept the board in the dark. He falsely told Intrusion's chairman and another director that the Customer A Shield contract provided additional revenue to Intrusion, when, in fact, it did not. Blount also resisted repeated requests from directors to see the Customer A contract until June 2021, when he finally allowed the chairman to see the Customer A contract. Intrusion's and Blount's false and misleading statements regarding the Customer A contract were material because they misstated and/or overstated the Company's success in marketing Shield, a product that was crucial to both the Company's near-term and long-term financial condition.

### *Intrusion and Blount Misrepresent Two More Customer Relationships*

27. Intrusion and Blount also made false and misleading statements about the Company's arrangements with two other businesses. On April 6, 2021, Intrusion issued a press release announcing that Customer B had "signed an agreement" for Shield, which quoted a Customer B executive. Intrusion made nearly identical claims about Customer B in an April 13, 2021 press release (referenced above in paragraph 23 in connection with the Company's Customer A contract misrepresentations) and in an April 22, 2021 press release issued to refute a negative research report (also referenced above in paragraph 23).

28.     Although Customer B had indicated an interest in purchasing Shield in March 2021, it did not sign a contract until early May 2021, after it negotiated a larger discount for the product. Blount led Intrusion's negotiations with Customer B until mid-April 2021 and knew that Customer B objected to Intrusion's proposed pricing. He also knew that Intrusion had not received a signed agreement from Customer B. Nonetheless, Blount authorized the April 6, 2021 press release.

29.     Intrusion and Blount also made misleading statements about the Company's relationship with a New Orleans-based government contractor ("Customer C"). In the April 13, 2021 press release, which Blount approved, Intrusion claimed that it had finished the first quarter "with several key wins" and referenced customers, including Customer C, adopting Shield to protect their networks. Later, during the Company's May 4, 2021 earnings call, Blount emphasized the rapid evaluation and implementation of Shield by telling a story about a demonstration he did for a New Orleans contractor. Blount stated that he demonstrated Shield and the contractor "bought the product the same day." Blount also claimed that when he jokingly said he could take Shield back with him, the customer's CIO said, "you're never getting that appliance out of my network" and that he would sign the contract that day.

30.     Blount admitted under oath that the firm referenced during the May 4, 2021 earnings call was Customer C. However, Customer C did not sign a contract for Shield. In fact, when Blount offered Shield for testing to Customer C's CEO (who was a friend) in late March 2021, Blount actually told him, "[y]ou don't have to sign a contract." And after he was fired by Intrusion in July 2021, Blount told his friend that he was the only one at the Company who knew that Customer C was testing Shield and suggested that Customer C return Shield to avoid being charged. Intrusion's and Blount's false and misleading statements regarding the purported contracts with Customer B and Customer C were material because they misstated and/or

overstated the Company's success in marketing Shield, a new product that was crucial to both the Company's near-term and long-term financial condition.

### *Intrusion Terminates Blount*

31. As described in paragraph 26 above, the Company's chairman learned in early June 2021 that, contrary to Blount's prior representations to him, Intrusion had actually provided Shield to Customer A for free. Around that time, the chairman also learned that Intrusion's beta tester conversion rate was much lower than Blount had claimed and that the Company had far exceeded its budgeted hiring. On July 19, 2021, Intrusion's board terminated Blount's employment.

### Intrusion Offered and Sold Securities

32. On August 25, 2020, Intrusion filed an offering registration statement with the SEC on Form S-1 seeking to register the sale of up to 3,565,000 shares of its common stock. An amended Form S-1 was declared effective on October 8, 2020, and thereafter Intrusion sold stock to the public. Intrusion also registered the offer and sale of common stock pursuant to an employee compensation plan on Form S-8 on May 7, 2018. The Company's false and misleading statements, which were authored and/or approved by Blount as described above in paragraphs 10 through 30, occurred during Intrusion's offer and sale of its common stock to the public and/or its employees.

### FIRST CLAIM FOR RELIEF

### Blount Violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

33. The SEC realleges and incorporates by reference each and every allegation contained in the paragraphs above.

34. By engaging in the acts and conduct alleged herein, Blount, directly or indirectly, in connection with the purchase or sale of a security, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

    (a) employed a device, scheme, or artifice to defraud; and/or

    (b) made an untrue statement of material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

35. By reason of the foregoing, Blount violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Blount Violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)]

36. The SEC realleges and incorporates by reference each and every allegation contained in the paragraphs above.

37. By engaging in the acts and conduct alleged herein, Blount, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, has:

    (a) knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

  (b) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

38. By reason of the foregoing, Blount violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

## **PRAYER FOR RELIEF**

THEREFORE, the SEC respectfully requests that the Court enter a Final Judgment that:

A. Permanently enjoins Defendant Blount from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

B. Permanently enjoins Defendant Blount from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

C. Orders, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], that Blount be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

D. Orders Defendant Blount to pay civil penalties under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

E. Grants such further relief as the Court deems just and proper.

Date: April 30, 2024	Respectfully submitted,

/s/ *Jason J. Rose*
JASON J. ROSE
Texas Bar No. 24007946
SECURITIES AND EXCHANGE
COMMISSION
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
(817) 978-1408 (jjr)
(817) 978-4927 (facsimile)
rosej@sec.gov

ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION